Donald *v.* Donald, Appellant.

Argued April 14, 1944. Before KELLER, P. J., BALD-
RIGE, RHODES HIRT, KENWORTHEY, RENO and JAMES, JJ.

*Anthony C. Troiano,* with him *Marvin D. Power* and
*Margiotti, Pugliese & Casey,* for appellant.

*W. M. Ewing,* for appellee.

OPINION BY KELLER, P. J., July 15, 1944:
The trial judge, admitting some difficulty in arriving
at a conclusion, granted the libellant husband a decree
of divorce on the ground of wilful and malicious deser-
tion, without a reasonable cause, for a space of two
years from September 22, 1939.

Our great respect for his judgment causes us some
difficulty, too, but as the burden of *establishing* the
libellant's charge of a wilful and malicious desertion
*by clear and convincing evidence* rested on him, and
in our opinion he has not met that burden, we arrive

at a different conclusion. We find no convincing evidence of a wilful and malicious desertion of the libellant by the respondent, when she left the common domicile on September 22, 1939, and nothing that occurred since to convert her leaving into a wilful and malicious desertion.

It is probable, as suggested by the learned counsel for appellee, that the marriage was an improvident one. She was not in robust health—she had had infantile paralysis, which left her with a halting walk—and his earnings were not enough to enable him to set up housekeeping by himself—though we would need corroboration from his employer, before we accepted his testimony that his wages from the Allis-Chalmers Company, after three years' employment, were only $18 a week. In any event, he lived at 100 Sheridan Avenue, Bellevue, with his mother, whose pension of $30 a month was needed for the upkeep of the home, and respondent fully understood that after their marriage she would live with her husband at his mother's home.

After living with her husband for three weeks, she became so seriously ill that her mother-in-law sent word to her parents who lived near Dubois, Clearfield County, Pennsylvania, that they should come and take her to their home. They did so and she was seriously ill and *confined to her bed* there for over a year, and was unable to return to her husband until May 29, 1938. Her husband visited her during her illness and on May 23, 1938 he wrote her a letter which he addressed "To my Sweetheart and Wife", and in which he said, inter alia, "Received your wee note of love and very happy to get it so promptly".

It appeared that during her long and critical illness— all the expenses of which were borne by her parents— she had consulted several doctors, and finally found one in Dubois, Doctor Davenport, who helped her more than any of the others. He diagnosed her illness as pernicious anemia and prescribed for her a certain medicine,

which was expensive, and certain treatments to be administered by him. He also ordered her to rest a great deal, not to overtire herself, and, among other dietary directions, to drink a quart of milk a day.

To get her treatments from Dr. Davenport, in whom she had great confidence, she made trips to her parents' home about once every two or three weeks, her sister taking her up and bringing her back without expense to her or her husband.

The doctor's directions as to her resting and her diet caused difficulties with her mother-in-law, who thought she was just lazy, and had no ailment whatever, and frequently said so; and at the same time, in order to emphasize her disbelief in her daughter-in-law's illness, would not allow the latter to help her or do anything about the house. The mother-in-law's testimony at the trial made this very clear, so much so that the trial judge, during the hearing, said: "She [the mother-in-law] stated here yesterday what her thought on the matter was, that any person who ate three meals a day and drank a quart of milk a day, there couldn't be much the matter with her. If that is her understanding, it is understandable what her thought is, and that is not a very commendable disposition at all, and it is not a disposition that indicates a pleasant companion."

The respondent testified that her mother-in-law treated her as an outsider—"She made me feel as though she didn't want me there and I was annoying her by staying there." Her mother-in-law insisted on respondent leaving her bedroom door open, even at night, and if she and her husband were talking in their room at night, his "mother would call in and tell Robert to go to sleep, that he had to work in the morning and that he should get his rest."

The mother-in-law's actions and attitude towards respondent aggravated her ill-health, and as a consequence Dr. Davenport advised her that she ought to

have three treatments a week, instead of the one every two or three weeks she had been getting. This would require her going to her parents' home while she received the additional treatments, and she told her husband she was going home for that purpose on September 22, 1939. He knew why she was going. He had been unable to buy her medicine, because, he said, he didn't have the money. She had some discussion with him the night before she left about her medicine and her relations with her mother-in-law—her husband taking his mother's part.

He accompanied her to the street car, which she took to go to Wilkinsburg, from which place she would be driven to her parents' home. He admits that she did not tell him she was *leaving* his home, and that he thought she was *going on a visit.* His attitude towards her then and his frame of mind may be seen from his testimony (Record p. 27) that she had *"shamed"* him because she wanted to kiss him as she was getting on the street car. So, too, on a Sunday morning a week or two before, when they were going to Sunday-school she was holding his arm and he told her not to do that— "I told her to walk by me without holding on". "Q. You knew she fell over from infantile paralysis? A. I know she did but I knew she could walk without me. Q. She had difficulty in walking? A. Not that much."

A very important item to be considered, as bearing on her intent when she went away on September 22, 1939, was that she left all her clothes, except a very few that she took with her, in her closet at 100 Sheridan Avenue, where they still were at the time of argument.

When she got to her parents' home, Dr. Davenport gave her three treatments a week for quite a while, reducing them to two and finally to one a week.

Her husband did not come to see her or answer her letters. She consulted an attorney who told her husband that she would live with him in an apartment, or

even in a single room, away from his mother's home, but she would not go back and live with her mother-in-law.

Three days after two years from September 22, 1939, he filed this libel alleging a wilful and malicious desertion as of that date.

We have frequently held that a wife cannot be required to live with her mother-in-law, and that a refusal to do so is not a wilful and malicious desertion, without reasonable cause. See, inter alia, *Hill v. Hill*, 96 Pa. Superior Ct. 410; *McCampbell v. McCampbell*, 64 Pa. Superior Ct. 143; *Isenberg v. Isenberg*, 75 Pa. Superior Ct. 551; *Reynolds v. Reynolds*, 62 Pa. Superior Ct. 280; *Hare v. Hare*, 133 Pa. Superior Ct. 134, 2 A. 2d 507.

The learned trial judge endeavored to distinguish this case from those by the fact that this respondent, before the marriage, had agreed to live in her mother-in-law's home—citing *Gooding v. Gooding*, 89 Pa. Superior Ct. 398. But the *Gooding* case was not a mother-in-law case. It was a case where a woman married a man with children by a prior marriage and understood that all of them would live together on his farm. A woman who marries a widower with children takes him with his encumbrances.

But, here, the respondent's agreement to live with her husband at his mother's home contemplated that she would be treated kindly, as a daughter should be. And when the mother-in-law, obsessed by the notion that the respondent was not ill, but only lazy, displayed towards her no kindly feeling, but, on the contrary, active dislike, and communicated that feeling to her son, respondent was not obliged to continue to dwell in a house where she was unwelcome, and eat the bitter bread of hatred. "Better is a dinner of herbs where love is, than a stalled ox and hatred therewith."

Our reading of the testimony as a whole fails to con-

vince us that the respondent wilfully and maliciously deserted her husband, but rather leads us to the conclusion that she went away because of her physical condition, in order to be more conveniently located for the treatments which her doctor told her were necessary; and then, as a consequence of her husband's coldness towards her influenced by his mother's dislike of her, she came to the conclusion that she could not live with him any longer at the home of his mother, although she was not only *willing* but *desirous* of living with him at any suitable place away from her mother-in-law.

The decree is reversed and the libel is dismissed at the costs of the appellee.